118  183
d154 ³458

WALKER v. SYMS.

1. BUILDING CONTRACTS — BRICK MEASUREMENTS — GENERAL CUS-
TOM.
  Where a building contract provides that brick furnished and laid
    shall be paid for at a stated amount per thousand, "measured
    in the wall," and is silent as to the method of measurement, a
    general custom of making such measurements without de-
    ductions for openings for doors and windows will prevail.

2. SAME—CONSTRUCTION—ARCHITECT AS ARBITRATOR.
  A provision in a building contract, that any question that may
    arise between the parties "as to the true intent and meaning
    of the plans and specifications" shall be referred to the archi-
    tect for final determination, confers upon the architect no au
    thority to decide as to the method of measurement of brick
    used in the walls.

3. SAME—ACTION ON CONTRACT—MECHANIC'S LIEN LAW.
  The failure of a building contractor to furnish to the owner a
    sworn statement as to the amounts due to subcontractors,
    laborers, and material men, as required by the lien law ( Act
    No. 179, Pub. Acts 1891, § 4 ), will not prevent his recovery on
    the contract, where it appears conclusively that none of such
    persons are in a condition to assert a lien, or to subject the
    owner to litigation.  So *held*, where suit was commenced more
    than two years after the work had been accepted by the
    owner.[1]

Error to Berrien; Coolidge, J.    Submitted June 17,
1898.    Decided September 20, 1898.

*Assumpsit* by Thomas A. Walker against William E.
Syms and George E. Dudley to recover a balance due
upon a building contract.   From a judgment for plain-
tiff, defendants bring error.   Affirmed.

---

[1] See *Martin* v. *Warren*, 109 Mich. 584, where it was held that the
mere lapse of the 60 days limited for the filing of liens by subcon-
tractors, laborers, and material men did not relieve the contractor
from the necessity of furnishing the statement as a condition pre-
cedent to his right to maintain a bill to enforce his lien.

*A. Plummer* and *Edward Bacon*, for appellants.

*L. C. Fyfe* and *M. L. Howell*, for appellee.

MOORE, J.   This case comes here upon special findings of the court.   The bill of exceptions does not purport to contain all the testimony taken upon the trial.   The plaintiff is a builder and contractor.   In August, 1893, he entered into a written contract with defendants, to erect for them a large factory building.   Soon thereafter he entered upon its construction.   It was completed, and the defendants took possession of it, in November, 1893, and were in possession when this suit was tried.   A controversy arose as to how much was due from defendants to plaintiff.   They were unable to agree upon the amount. Plaintiff sued defendants, and recovered a judgment against them, from which judgment defendants appeal.

Those portions of the contract important in this discussion read as follows:

"The said party of the first part further agrees that all work performed under this contract shall be done in strict accordance with the plans and accompanying specifications prepared for the erection of the said buildings by E. A. Ellsworth, architect; and any questions that may arise between the said parties to this contract as to the true intent and meaning of the said plans and specifications shall be referred to the architect (or, in his absence, to Louis R. Lavalle, representing the said architect as superintendent of construction), whose decision shall be final and binding upon both parties to this agreement.   The entire work, when finished and completed, shall be subject to the final examination of the said architect, and all shall be made to meet his acceptance truly to the requirements of the specifications before this contract will be acknowledged and accepted as complete by the said parties of the second part. *   *   *   And it is further agreed by the said party of the first part that all work shall be finished and delivered up to the said parties of the second part free from all mechanics' liens or other claims upon the same.   And the said parties of the second part, in consideration of the complete fulfillment of all the conditions hereinbefore set forth, covenant and agree, for themselves, their heirs, executors,

or administrators, with the said party of the first part, to well and truly pay to the said party of the first part a sum of money equal to eight and twenty-five one-hundredths ($8.25) dollars, lawful money of the United States of America, for each and every thousand of brick, and part thereof in like proportion, measured in the walls, at the rate of twenty-two and one-half (22½) brick per cubic foot of.wall; the said price being based on the cost of said brick, delivered on the site of the said proposed buildings, at the rate of five and fifty-five one hundredths ($5.55) dollars per thousand (actual count)."

The first dispute between the parties grows out of the measurement of the work. It is the claim of the plaintiff that the measurements should be controlled by the custom in Michigan, which he claims is to measure the outside of the wall, not deducting anything for the openings made by doors and windows; he contending the custom is a reasonable one, as the construction of the wall without openings takes less time and costs less than one with many windows and doors. It is the claim of defendants that they were ignorant of any such custom, and that the space occasioned by the doors and windows should be deducted from the measurements. The circuit judge found that the contract did not provide for any particular method of measurement, and did not leave the method of measurement to the architect or superintendent, and that the language of the contract was ambiguous as to the method of measurement. He also found that, at the time when the contract was made, there was existing in this State, and many of the other States, a custom, which was uniform, general, of long standing, and reasonable, in measuring brick walls, of counting the openings as part of the solid wall, and that plaintiff, in making his contract, relied upon this custom. In the disposition of the case by the circuit judge, he treated the openings as part of the wall. Was he justified in doing so? An inspection of the contract shows no method was pointed out of making the measurements. It also fails to show, in case of a disagreement between the parties as to the method, that the

architect or superintendent shall determine. The matters so referred to them are "any questions that may arise between the said parties to this contract as to the true intent and meaning of the said plans and specifications." This language is not broad enough to convey the authority to decide the disputed question of method of measurement. The contract, then, not providing for the method of measurement, how shall it be decided, except by the custom of the place where the contract is made and performed?

In *Lowe* v. *Lehman*, 15 Ohio St. 179, there was a written contract for the construction of a brick wall, where payments were to be made for the brick furnished and laid in the wall, at $6.25 a thousand. The contract was silent as to the method of measurement. Parol proof was given as to the custom which controlled such measurements. This was said to be error, *first*, because it contradicted a written instrument by parol, and, *second*, because the custom was unreasonable. In affirming the judgment of the court below, this language is used:

"We are unable to see anything unreasonable in the custom. The workman was to furnish the brick and materials, and lay them up, by the thousand. The contract contains no specification of the dimensions, shape, angles, openings, or arches of the wall, or of the size of the brick. It does not require a mason to know that the value of the work and materials depends much upon these and such like conditions, if they are to be paid for by the numerical thousand. Again, the brick are to be 'furnished' as well as to be laid up. Where and how will you count them numerically? Will you count them at the kiln, on the ground, or in the wall? And who will lose the breakage in transportation and in handling, and the waste of filling them into the wall? Some fair measurement of the wall would seem to be a more reasonable method. And we cannot say that this method was not a fair one. It slightly increased the estimated number of bricks in the wall, it is true, by making small additions for extra work, and extra waste of brick, at the angles and openings; and the rule of measurement adopted fixes upon an arbitrary and uniform dimension for the average

size of the brick, which may vary slightly, but cannot vary much, from their true average size. All this seems to us reasonable.

"Neither do we think that proof of this custom is objectionable on the ground that it contradicts the contract. Authorities to support this view are numerous and almost uniform, and the rule is of every-day application. It is applied to shingles, to printers' ems, to lumber, etc. It is applied to measures and weights of numerous commodities. A ton of one article often contains over, and sometimes under, 2,000 pounds, and not unfrequently more pounds in one place than in another. In 2 Pars. Cont. the author says that custom 'may give to words of number an entirely different sense from that which they usually bear.' He cites numerous cases to that effect. Among them are *Smith* v. *Wilson*, 3 Barn. & Adol. 728, where '1,000 rabbits' was held to mean 1,200 rabbits, by the custom; and *Hinton* v. *Locke*, 5 Hill, 437, where '12 shillings per day' was made to mean 12 shillings per 10 hours, or 1¼ days for every day on which 12½ hours' work was done. But it is useless to multiply authorities. The reason and necessity of the rule lies at the foundation of all language. It is as true now as it was in the time of Horace that custom is at once the arbiter and standard of language,—'*Usus, quem pene et jus et norma loquendi.*' It belongs to the imperfection of language that while much the larger part of its words become, by usage, fixed and universal in their meaning, yet some of them must always be left subject to the changes and variations necessarily occasioned by local usages and the customs of trades.

"We are of opinion, therefore, that proof of this custom was properly admitted by the court. We hold that it was not necessary to set it out in the petition; that it was a reasonable custom; and that it does not contradict or vary the written contract in any objectionable sense."

In *Patterson* v. *Crowther*, 70 Md. 124, the same doctrine is held. See, also, *Walls* v. *Bailey*, 49 N. Y. 464 (10 Am. Rep. 407); *Breen* v. *Moran*, 51 Minn. 525; *Miller* v. *Botto*, 79 Ill. 535. The following cases, though not directly in point, bear upon the question: *Merick* v. *McNally*, 26 Mich. 374; *McDonnell* v. *Ford*, 87 Mich. 198.

Before bringing this suit, plaintiff had not made out and

given to the owners a statement under oath of the number and names of the subcontractors, laborers, and material men. It is claimed that, under the provisions of section 4 of Act No. 179, Pub. Acts 1891, this action cannot be maintained because said statement was not furnished. The trial judge found that no statement of this kind was ever requested, and that, when this suit was commenced, all laborers and contractors had been paid in full, and that all the labor done and materials furnished had been paid for; and it did not appear that any laborer or material man had ever served any notice of any claim under the mechanic's lien law. He further found the work done by plaintiff was completed and accepted by the defendants, and was free from all mechanics' liens or other claims at such time. This suit was not commenced until more than two years after the building was accepted by defendants. The time in which any person could assert a lien as sub-contractor, laborer, or material man had long elapsed. Section 22 of the act provides:

"Except as herein otherwise expressly provided, nothing in this act contained shall be construed to prevent any creditor in any such contract from maintaining an action thereon at common law in like manner as if he had no lien for the security of his debt."

The plaintiff in this case is not attempting to assert a lien under the mechanic's lien law. It appears conclusively the situation is such that none of the laborers, subcontractors, or material men are in a condition to assert a lien, or to subject defendants to litigation on that account. In the case of *Barnard* v. *McLeod*, 114 Mich. 73, Justice HOOKER used this language:

"We do not intend to be understood as saying that the service of such sworn statement is necessarily jurisdictional, and that neglect to serve is fatal in all cases, or that it cannot be waived. Possibly it should not be allowed to stand in the way of recovery where the absence of other liens and the opportunity to effect them are conceded or obvious. This provision is a shield, and, while it

should be given full effect for that purpose, its mission may be held to end with the possibility of such use, should such case arise."

The case suggested by Justice HOOKER is now here. The use here made of the provision of the statute is not that of a shield on the part of the owner against possible liens, but it is an attempt to use the statute to prevent the rendition of a judgment which, according to the findings of the court, ought to be rendered.

Other questions are raised and discussed by counsel, but the finding of facts conclusively disposes of them, and their discussion would be unprofitable.

Judgment is affirmed.

The other Justices concurred.