## UNITED CONST. CO. v. TOWN OF HAVERHILL, N. H., et al.

(Circuit Court of Appeals, Second Circuit. November 9, 1925.)

### No. 62.

1. **Appeal and error** ⚖➽930(1)—**Reviewing tribunal required to assume, on appeal from verdict for plaintiff, that defendant had broken contract.**

In action for breach of contract in failing to excavate to solid ledge in building bridge pier, as required by specifications, on appeal from verdict for plaintiff, reviewing tribunal was required to assume that defendant had so failed.

2. **Bridges** ⚖➽20(4)—**Misrepresentation excused contractor from excavating to solid ledge as required by contract.**

If plans and specifications for bridge were a representation as to character of foundation at depth specified therein, contractor was excused by misrepresentation from performance of its promise to excavate to solid ledge.

3. **Bridges** ⚖➽20(4)—**Breach of contract for construction of bridge for failure to excavate to solid ledge held excused.**

Plans and specifications for bridge *held* representation that, if contractor built piers at prescribed depth, rock which he would find was solid ledge, so as to excuse his failure to excavate to solid ledge as agreed.

In Error to the District Court of the United States for the District of Vermont.

Action by the Town of Haverhill, N. H., and another, against the United Construction Company. Judgment for plaintiffs, and defendant brings error. Reversed, and new trial ordered.

Writ of error to a judgment of the District Court of Vermont in an action at law. The towns of Haverhill, N. H., and Newbury, Vt., sued the defendant in the Vermont state court for breach of its contract to build a bridge across the Connecticut river between Wells River, Vt., and Woodsville, N. H. The cause was removed to the United States District Court of Vermont, and tried to a jury, which rendered a verdict for the plaintiffs in the sum of $53,642.18. To the judgment entered on this verdict the defendant sued out the writ at bar.

On November 4, 1916, the plaintiff towns entered into a contract with the defendant by which the latter at an agreed price undertook to build a bridge in accordance with certain plans and specifications annexed thereto. The defendant agreed to "be accountable for the full performance of this contract, and by signing hereof admits that the said plans, elevations, sections, specifications and parts * * * are sufficient for the intended purpose of doing said work and that the work can be successfully executed in accordance therewith." The defendant built the bridge following the plans and specifications, and the towns accepted it in 1917 and completed the payments on October 17, 1918. In a freshet during the spring of 1922 the western pier of two in the body of the river gave way, sank, and wrecked the whole structure, so as to destroy it, save for some trivial salvage.

The contract required the defendant to excavate for the piers to "solid ledge," and there was reason to suppose that the pier sank because this had not been done. Hence the towns brought suit against the defendant for breach of its promise, seeking to recover the whole amount paid, less the salvage. They gave evidence on the trial which justified a verdict that the defendant had never gone to solid ledge, and that its failure to do so was the cause of the trouble. The defendant answered that it had built the piers in accordance with the dimensions shown in the plans, which, if read with the specifications, constituted a representation that with piers of the prescribed dimensions solid ledge would be reached; that therefore the responsibility for the miscarriage was with the engineer, who, having tested the bottom, con-

cluded that what he had found at the specified depths was the ledge required; that it had relied upon this representation, as under the contract it might, and that the breach of its promise to excavate to solid ledge was therefore excused.

The learned District Court declined to construe the contract in the defendant's sense, and instructed the jury that the defendant's promise was unconditional. He left to them only the question whether the excavation had in fact gone to solid ledge, and whether, if not, the defendant's failure had caused the collapse of the bridge. The verdict was for the original cost, with interest, less salvage.

The specifications provided that the work should be under the direct charge of a named engineer, who had power to direct the defendant "regarding work, material or methods," and to interpret the plans and specifications in case of a dispute between the parties. It further provided that the bridge should be built "as set forth in these specifications and a set of plans accompanying the same." "The plans and specifications are intended to give complete instructions governing the work and materials, but the contractor * * * will not be released from any liability due to his failure to make the work complete and satisfactory."

Under the title "General Measurements" the specifications provided as follows:

"Before the work is begun, the contractor shall examine the site and the proposed location, and check and be responsible for all general measurements, length of spans, character of foundation, depth of water, etc.

"In case the contractor shall discover any errors in the general dimensions as shown on the plans, for either sub or super structure, the attention of the consulting engineer shall be called to the same and the necessary changes in plans made before any work is done."

The critical stipulation was under the caption "Excavation" and read as follows:

"Excavation may be done in the way best adapted to the work in hand, but shall be done to the line shown and to the satisfaction of the engineer. Excavation for the piers shall be made to solid ledge. The ledge shall be cleaned off by removing any sand, gravel or foreign substances, and if necessary leveled or stepped to provide a good and satisfactory foundation for the masonry."

Under the title "Cofferdams" it was provided that "the line shall conform to the lines of the work shown on the plans"; under "Concrete," that the "piers shall be of con-

crete masonry, as per plans, built and laid to lines and elevations given."

Under the title "Plans" it was agreed that "the plans on file show all sizes of main members and details in a general way, and no modifications shall be made except with the consent of the consulting engineer."

Among the plans annexed to the specifications were two sheets, Nos. 1 and 2, of "Scheme B," which portrayed the two river piers; sheet 1 in a profile of the bridge as a whole; sheet 2 in two elevations at faces 90 degrees apart. On sheet 1 the piers are shown of different lengths, with an irregular line to indicate their bases. On sheet 2 the height of the concrete base for the west pier is fixed at 18 feet 6 inches, and for the east pier 9 feet 6 inches.

At the trial the chief issue in the defense was whether the defendant had made out an excuse for its failure to excavate to the ledge. Supplementing its position that as matter of law and on the face of the papers the dimensions of the piers constituted a representation that they would rest on the solid ledge, the defendant offered to prove by engineers that the plans and specifications, if read together, meant to a contractor that these depths were sufficient. Further it offered to show that the towns' engineer had told the defendant, before it executed the contract, that the piers would rest on the solid ledge, if built to the prescribed dimensions. The theory of this proof was that the parties had thus come to a convention as to the meaning of the plans, in case that meaning was not fixed by the contract. Both kinds of proof the learned District Court excluded on the ground that the plans and specifications needed no elucidation and that they constituted the authoritative memorial of the parties' intent.

There was evidence that the engineer had been called to pass upon the cofferdams when built, and had directed the defendant's foreman to begin to build the piers, after cleaning out some pockets of gravel in the rock on which the dams then rested. That rock was not the solid ledge, but both parties supposed it to be, and each had made tests which were thought reliable to ascertain its character. In fact, the solid ledge was from 15 to 35 feet lower.

M. P. Maurice, of Brattleboro, Vt., and Louis E. Wyman, of Manchester, N. H., for plaintiff in error.

Charles H. Darling, of Burlington, Vt., and Raymond U. Smith, of Woodsville, N. H., for the defendants in error.

Before HOUGH, MANTON, and HAND, Circuit Judges.

HAND, Circuit Judge (after stating the facts as above). [1] Upon the verdict we must assume that the defendant had not performed its promise to excavate to the solid ledge, and this was unquestionably a breach which it must excuse. It seeks to excuse the breach because of the representation in the plans and specifications that piers of the prescribed dimensions would reach to solid ledge and that it need not excavate further. The towns retort that the plans represented nothing of the kind, and that, if they did, the defendant had undertaken to be responsible for the foundations and had no right to rely upon the plans.

[2] The last position of the towns is certainly untenable under the most recent decisions of the Supreme Court. If the plans and specifications were in fact a representation as to the character of the foundation at that depth, the general engagement of the defendant to be responsible for foundations does not excuse the towns for the misrepresentation, but, on the contrary, the misrepresentation itself excuses the defendant from the performance of its promise to excavate to solid ledge.

These cases are Hollerbach v. U. S., 233 U. S. 165, 34 S. Ct. 553, 58 L. Ed. 898; U. S. v. Spearin, 248 U. S. 132, 39 S. Ct. 59, 63 L. Ed. 166; U. S. v. Atlantic Dredging Co., 253 U. S. 1, 40 S. Ct. 423, 64 L. Ed. 735. The contractor's undertaking was different in each one, and in none was it exactly like the defendant's agreement in the present case. However, the result depended in no instance upon the exact language used, though at least in U. S. v. Atlantic Dredging Co., this was as broad in effect as here. All the contracts attempted to put upon the contractor the duty of satisfying himself as to the physical conditions surrounding his work; all were held insufficient in the face of a representation made by the public authorities, who must be understood to have had a better opportunity to know.

The case of Christie v. U. S., 237 U. S. 234, 35 S. Ct. 565, 59 L. Ed. 933, is akin; but there the United States kept back information which would have disclosed the truth, and the result apparently depended upon that circumstance. It is not quite apparent why that should not have been taken as the ground of decision in U. S. v. Atlantic Dredging Co.; but, though it is mentioned in the opinion, we read the case as falling within the general doctrine most broadly laid

down by Mr. Justice Brandeis in U. S. v. Spearin, at pages 136, 137 (39 S. Ct. 59), which we understand to be the authoritative declaration of the court. This understanding of the cases we share with the Circuit Court of Appeals for the Third Circuit, Passaic, etc., Com'rs v. Tierney, 1 F.(2d) 304. There must, we should suppose, be some form of words by which a contractor could engage to assume all risks of the terrain, and absolutely to execute the work, notwithstanding what he might be told by the public authorities. However, it is clear that a rigorous construction of such general clauses is discountenanced, and that, if the contractor is to be bound so absolutely, it must be by language which leaves no question that the representations are not to be taken as even provisionally reliable.

[3] Therefore, as we view it, we have only to consider the question whether the plans and specifications, taken together, constituted a representation that, at the depths indicated on sheet 2 of "Scheme B," solid ledge would be found. We believe that this was undoubtedly the meaning, quite independently of what was said at the time of the execution of the contract, or whether the plans alone would so read to an engineer.

That in fact the engineer supposed that he had reached solid ledge can admit of no doubt. He was preparing plans for the erection of a bridge meant to be built upon nothing else. His plans were to fit upon his specifications, and it is, of course, incredible that he should not have believed that they were sufficient. We do not see how the defendant could have read them otherwise, or have failed to understand the engineer in that sense. So much for the general situation.

The language used in the specifications fully bears out this general conclusion. The excavation was to be done to the "line shown." We know of no line shown anywhere, except those upon sheets 1 and 2, and we cannot imagine what else the clause means, if it does not incorporate the lines by reference. But the specifications go further. They provide that the plans show the size of the main members, which the contractor must follow, and that the piers were to be built to the lines and elevations given in the plans. The only thing which showed the size of the piers or their elevation was the sheets in question, and these did. The cofferdams were to conform to the lines shown on the plan. We find none but the lines indicating the bottom. No work was to be done outside the lines, except with the engineer's consent, or it would not be paid for. If there were errors in the dimensions given, and surely an error of 15 or 35 feet was substantial, the work must stop and the engineer must change them. All this inexorably referred to the figures given on the plans, and meant that they should control.

But, if there could be any further doubt, the contract itself resolved it, because it provided that the contractor admitted by execution that the plans and specifications were sufficient for the work. It is incredible that the contractor should be compelled to admit the adequacy of plans presented by the authorities, and yet that the authorities should not themselves be understood to assert the same thing. Plainly the meaning of the plans and specifications was that, if the defendant built the piers at the prescribed depths, the rock which he would find, and which he did find at just those depths, was the solid ledge to which he must excavate. To throw upon the contractor the risk involved in its solidity would be a perversion of the parties' intention.

Therefore it seems to us unnecessary to consider whether the learned District Court was wrong in excluding all evidence of any collateral understanding between the parties as to the meaning of the base lines on sheets 1 and 2. Nor shall we consider whether the expert evidence of engineers as to their meaning should have been admitted. All this proof was adduced by the defendant, and the defendant did not need it. It could stand upon the contract as it read, and a verdict should have been directed in its favor.

Judgment reversed and new trial ordered.